**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

RONALD M. THOMPSON,

      Plaintiff,

Case No. 1:10-cv-371

Spiegel, J.
Bowman, M.J.

    vs.

MICHAEL J. ASTRUE,
COMMISSIONER OF SOCIAL SECURITY,

      Defendant.

**REPORT AND RECOMMENDATION**

Plaintiff Ronald M. Thompson filed this Social Security appeal in order to challenge the Defendant's finding that he is not disabled. *See* 42 U.S.C. §405(g). Proceeding through counsel, Plaintiff presents five claims of error, all of which Defendant disputes. Pursuant to local practice, this case has been referred to the undersigned for initial consideration and a report and recommendation. 28 U.S.C. §636(b). As explained below, I conclude that the ALJ's finding of non-disability should be affirmed, because it is supported by substantial evidence in the administrative record.

**I. Summary of Administrative Record**

On November 18, 2005, Plaintiff filed applications for Supplemental Security Income (SSI) and for Disability Insurance Benefits (DIB) alleging a disability onset date of July 15, 2005, due to a stroke. (Tr. 3, 40-43, 65). Plaintiff was born on February 3, 1959, thus, he was 46 years old at the time of his alleged disability and 49 years old at

the time of the ALJ's decision.  (Tr. 21).  After Plaintiff's claims were denied initially and upon reconsideration, (Tr. 25-33), he requested a hearing *de novo* before an Administrative Law Judge ("ALJ").  (Tr. 34-39).  On August 11, 2008, an evidentiary hearing was held in Cincinnati, Ohio, at which Plaintiff was represented by counsel.  (Tr. 281-304).  At the hearing, ALJ Larry A. Temin ("ALJ Temin") heard testimony from Plaintiff and Micha Daoud, an impartial vocational expert ("VE Daoud").

On September 9, 2008, ALJ Temin entered his decision denying Plaintiff's SSI and DIB applications.  (Tr. at 10).  ALJ Temin's "Findings," which represent the rationale of the decision, were as follows:

1.  The claimant meets the insured status requirements of the Social Security Act through December 31, 2010.

2.  The claimant has not engaged in substantial gainful activity since July 15, 2005, the alleged onset date (20 CFR 404.1520(b), 404.1571 *et seq.,* and 416.971 *et seq.*).

3.  The claimant has the following severe impairments: status post July 15, 2005 cerebrovascular accident, hypertension, and borderline intellectual functioning (20 CFR 404.1520(c) and 416.920(c)).

    ……………………

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

    ……………………

5.  After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform the requirements of work activity except as follows: he can lift/carry/push/pull up to 20 pounds occasionally and 10 pounds frequently, but no more than 10 pounds with his left hand alone.  He can stand and/or walk for two hours in an eight-hour workday (for 30 minutes at a time, then must be able to sit for two to three minutes).  He can only occasionally stoop, kneel, crouch and climb ramps and stairs.  He should not crawl, balance,

climb ladders, ropes or scaffolds, operate controls with his left lower extremity or perform other work requiring the forceful use of the left lower extremity, work at unprotected heights, or work around hazardous machinery. He needs an assistive [device] for ambulation and for standing. He has no sitting restriction. He is able to remember and carry out only short and simple instructions.

......................

6.  The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

......................

7.  The claimant was born on February 3, 1959 and was 46 years old, which is defined as a younger individual age 45-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

......................

8.  The claimant has a limited education and is able to communicate in English (20 CFR 404.1564 and 416.964).

......................

9.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

......................

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1560(c), 404.1566, 416.960(c), and 416.966).

......................

11. The claimant has not been under a disability, as defined in the Social Security Act, from July 15, 2005, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

......................

(Tr. 15-22).   Thus, ALJ Temin concluded that Plaintiff was not under disability as defined by the Social Security Regulations and was not entitled to SSI or DIB.  (*Id.*).

Plaintiff's request for review by the Appeals Council was denied (Tr. 4-7), making the decision of ALJ Temin the final administrative decision of the Commissioner.

### II. Applicable Law

The following principles of law control resolution of the issues raised in this case. Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. §405(g).   The Court's sole function is to determine whether the record as a whole contains substantial evidence to support the Commissioner's denial of benefits. Substantial evidence is "such relevant evidence as a reasonable mind might except as adequate to support a conclusion."  *Richardson v. Perales,* 402 U.S. 389, 401 (1971) (citing *Consolidated Edison Co. v. N.L.R.B.,* 305 U.S. 197, 229 (1938)).   In deciding whether the Commissioner's findings are supported by substantial evidence, the Court must consider the record as a whole.   *Hephner v. Matthews,* 574 F.2d 359 (6th Cir. 1978).   If substantial evidence supports the ALJ's denial of benefits, then that finding must be affirmed, even if substantial evidence also exists in the record to support a finding of disability.  *Felisky v. Bowen,* 35 F.3d 1027, 1035 (6th Cir. 1994).  As the Sixth Circuit has explained:

> The Secretary's findings are not subject to reversal merely because substantial evidence exists in the record to support a different conclusion. … The substantial evidence standard presupposes that there is a 'zone of choice' within which the Secretary may proceed without interference from the courts.   If the Secretary's decision is supported by substantial evidence, a reviewing court must affirm.

*Id.*  (citations omitted).

To qualify for DIB, plaintiff must meet certain insured status requirements, be

under age 65, file an application for such benefits, and be under a disability as defined by the Social Security Act.  42 U.S.C.  §§416(i), 423.  Establishment of a disability is contingent upon two findings.  First, plaintiff must suffer from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months.  42 U.S.C. §423(d)(1)(A).  Second, the impairments must render the plaintiff unable to engage in the work previously performed or in any other substantial gainful employment that exists in the national economy.  42 U.S.C. §423(d)(2).

To qualify for SSI, plaintiff must file an application and be an "eligible individual" as defined in the Act.  42 U.S.C. §1382(a); 20 C.F.R. §416.202.  Eligibility is dependent upon disability, income, and other financial resources.  20 C.F.R.  §416.202.  To establish disability, plaintiff must demonstrate a medically determinable physical or mental impairment that can be expected to last for a continuous period of not less than twelve months.  Plaintiff must also show that the impairment preludes performance of the work previously done, or any other kind of substantial gainful employment that exists in the national economy.  20 C.F.R §416.905.

Regulations promulgated by the Commissioner establish a sequential evaluation process for disability determinations.  20 C.F.R. §404.1520.  First, the Commissioner determines whether the individual is currently engaging in substantial gainful activity; if so, a finding of nondisability is made and the inquiry ends.  Second, if the individual is not currently engaged in substantial gainful activity, the Commissioner must determine whether the individual has a severe impairment or combination of impairments; if not, then a finding of nondisability is made and the inquiry ends.  Third, if the individual has a

5

severe impairment, the Commissioner must compare it to those in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1 (Listing).  If the impairment meets or equals any within the Listing, disability is presumed and benefits are awarded. 20 C.F.R. §404.1520(d).  Fourth, if the individual's impairments do not meet or equal those in the Listing, the Commissioner must determine whether the impairments prevent the performance of the individual's regular previous employment.  If the individual is unable to perform the relevant past work, then a prima facie case of disability is established and the burden of going forward with the evidence shifts to the Commissioner to show that there is work in the national economy which the individual can perform.  *Lashley v. Secretary of H.H.S.,* 708 F.2d 1048 (6th Cir. 1983); *Kirk v. Secretary of H.H.S.,* 667 F.2d 524 (6th Cir. 1981).

The Commissioner is required to consider the individual's impairments in light of the Listing of Impairments.  20 C.F.R. Part 404, Subpart P, Appendix 1.  The Listing sets forth certain impairments which are presumed to be of sufficient severity to prevent the performance of work.  20 C.F.R. §404.1525(a).  If the individual suffers from an impairment which meets or equals one set forth in the Listing, the Commissioner renders a finding of disability without consideration of the individual's age, education, and work experience.  20 C.F.R. §404.1520(d); *Kirk,* 667 F.2d at 528.

An impairment can be considered as not severe only if the impairment is a "slight abnormality" which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, and work experience.  *Farris v. Sec'y of HHS,* 773 F.2d 85, 90 (6th Cir. 1985) (citation omitted); *see also, Bowen v. Yuckert,* 482 U.S. 137 (1987).

Plaintiff has the burden of establishing disability by a preponderance of the evidence. *Born v. Secretary of Health and Human Servs.* 923 F.2d 1168, 1173 (6th Cir. 1990); *Bloch v. Richardson,* 438 F.2d 1181 (6th Cir. 1971).  Once plaintiff establishes a prime facie case by showing an inability to perform the relevant previous employment, the burden shifts to the Commissioner to show that plaintiff can perform other substantial gainful employment and that such employment exists in the national economy. *Harmon v. Apfel,* 168 F.3d 289, 291 (6th Cir. 1999); *Born,* 923 F.2d at 1173; *Allen v. Califano,* 613 F.2d 139 (6th Cir. 1980).  To rebut a prima facie case, the Commissioner must come forward with particularized proof of plaintiff's individual capacity to perform alternate work considering plaintiff's age, education, and background, as well as the job requirements.  *O'Banner v. Secretary of H.E.W.,* 587 F.2d 321, 323 (6th Cir. 1978).  *See also Richardson v. Secretary of Health and Human Services,* 735 F.2d 962, 964 (6th Cir. 1984) (per curiam).  Alternatively, in certain instances the Commissioner is entitled to rely on the medical-vocational guidelines (the "grid") to rebut plaintiff's prime facie case of disability. 20 C.F.R. Subpart P, Appendix 2; *O'Banner,* 587 F.2d at 323.  *See also Cole v. Secretary of Health and Human Services,* 820 F.2d 768, 771 (6th Cir. 1987).

When the grid is not applicable, the Commissioner must make more than a generalized finding that work is available in the national economy; there must be "a finding supported by substantial evidence that a claimant has the vocational qualifications to perform *specific* jobs."  *Richardson,* 735 F.2d at 964 (per curiam) (emphasis in original); *O'Banner,* 587 F.2d at 323.  When the grid is inapplicable, the testimony of a vocational expert is required to show the availability of jobs that plaintiff

can perform. *Born,* 923 F.2d at 1174; *Varley v. Secretary of H.H.S.,* 820 F.2d 777, 779 (6th Cir. 1987).

At Step 5 of the sequential evaluation process, the burden shifts to the Commissioner "to identify a significant number of jobs in the economy that accommodate the claimant's residual functional capacity (determined at step four) and vocational profile." *Jones v. Commissioner of Social Sec.,* 336 F.3d 469, 474 (6th Cir. 2003). The Commissioner may meet his burden of identifying other work the claimant can perform through reliance on a vocation expert's testimony to a hypothetical question. To constitute substantial evidence in support of the Commissioner's burden, the hypothetical question posed to the vocational expert must accurately reflect the claimant's mental and physical limitations. *Early v. Commissioner of Social Security,* 594 F.3d 504, 516 (6th Cir. 2010); *Howard v. Commissioner of Soc. Sec.,* 276 F.3d 235, 241 (6th Cir. 2002); *Felisky,* 35 F.3d at 1036. However, "the ALJ is not obliged to incorporate unsubstantiated complaints into his hypotheticals." *Stanley v. Secretary of H.H.S.,* 39 F.3d 115, 118 (6th Cir. 1994).

It is the province of the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant. *Rogers v. Commissioner of Social Security,* 486 F.3d 234, 247 (6th Cir. 2007) (citations omitted). In light of the Commissioner's opportunity to observe the individual's demeanor, the Commissioner's credibility finding is entitled to deference and should not be discarded lightly. *Buxton v. Halter,* 246 F.3d 762, 773 (6th Cir. 2001); *Kirk,* 667 F.2d at 538. "If an ALJ rejects a claimant's testimony as incredible, he must clearly state his reasons for doing so." *Felisky,* 35 F.3d at 1036. The ALJ's articulation of reasons for crediting or rejecting a

claimant's testimony must be explicit and "is absolutely essential for meaningful appellate review." *Hurst v. Sec. of H.H.S.,* 753 F.2d 517, 519 (6th Cir. 1985) (citing *Zblewski v. Schweiker,* 732 F.2d 75, 78 (7th Cir. 1984)).

The ALJ is not free to make credibility determinations based solely upon an "intangible or intuitive notion about an individual's credibility." *Rogers,* 486 F.3d at 247. Rather, such determination must find support in the record. *Id.* Whenever a claimant's complaints regarding symptoms of their intensity and persistence are not supported by objective medical evidence, the ALJ must make a determination of the credibility of the claimant in connection with his or her complaints "based on a consideration of the entire case record." *Id.* The entire case record includes any medical signs and lab findings, the claimant's own complaints of symptoms, any information provided by the treating physicians and others, as well as any other relevant evidence contained in the record. *Id.* Consistency between a claimant's symptom complaints and the other evidence in the record tends to support the credibility of the claimant while inconsistency, although not necessarily defeating, should have the opposite effect. *Id.* In this case, Plaintiff alleges that the five identified errors at the fourth, fifth, and sixth steps of the sequential analysis require this Court to reverse the Commissioner's decision.

### III. Medical Record

On July 14, 2005, Plaintiff was examined at University Hospital's emergency department due to complaints of weakness and fatigue. (Tr. 237-239). Plaintiff's blood pressure was 221/151 and his heart rate was slightly elevated. (Tr. 237-238). Plaintiff's EKG and chest x-ray results were unremarkable. (Tr. 130, 240). Following Plaintiff's examination he reported that he felt better and returned home. (Tr. 240).

On July 15, 2005, Plaintiff was admitted to the Christ Hospital complaining of weakness and numbness on the left side of his body. (Tr. 129, 132-133). Plaintiff reported that he had difficulty walking and noted an inability to lift his left leg. (*Id.*). Plaintiff also reported decreased strength in his left upper and lower extremities. (*Id).* On admission, Plaintiff's blood pressure was 182/126. (Tr. 130). Emergency room personnel noted Plaintiff's non-compliance with his blood pressure medication and tobacco usage. (Tr. 128-129, 132-133, 154). A head CT scan was performed which was positive for posterior rim of the internal capsule acute infarct. (Tr. 127, 133, 140-141, 144-145, 147, 149, 152, 154). Further examination of Plaintiff revealed that he had obvious weakness on the left side of his body and a left facial droop. (Tr. 133). Plaintiff was found to have an acute cerebral infraction, severe hypertension with urgency, and tobacco abuse. (*Id.*). Plaintiff was subsequently diagnosed with a stroke. (Tr. 127, 131). As a result, Plaintiff was hospitalized from July 15, 2005 to July 19, 2005. (Tr. 127). On July 19, 2005, Plaintiff was discharged to a rehabilitation facility for outpatient and physical therapy for activities of daily living, self-care, mobility, transfer training and gait training. (Tr. 127-128).

Plaintiff received inpatient rehabilitation from July 19, 2005 to August 5, 2005. (Tr. 151A-153). During Plaintiff's initial physical examination, Plaintiff exhibited decreased active range of motion on his left side with left hemiparesis, with motor strength of 3 to 4-/5 in his left arm and 4- to 4/6 in his left leg. (Tr. 155). Plaintiff's cranial nerves and sensation were intact. (Tr. 155). At the time of discharge, on a scale of 1-5, Plaintiff's left-side strength had improved to a 4 to 4-/5 in his left arm and a 4 to 5 in his left leg, his functional status was "modified independent to independent with his

ADLs [activities of daily living] and self-care," and his cognition and communication were within functional limits.  (Tr. 152).

On September 15, 2005, Plaintiff's primary care physician, Eric Warm, M.D. (Dr. Warm), began treating Plaintiff for his hypertension and complications resulting from the stroke.  (Tr. 236).  At this time, Dr. Warm's treatment notes reported that Plaintiff had no new stroke symptoms.  (Tr. 236).  On October 4, 2005, Plaintiff complained of baseline weakness in his left leg and arm and used a cane to ambulate.  (Tr. 230).  Dr. Warm noted that Plaintiff exhibited normal range of motion and 5/5 motor strength in all of his extremities, including his left leg and arm, and displayed normal neurological findings. (*Id*).  Dr. Warm also noted that Plaintiff had high blood pressure and that his left hemiparesis was improving with physical therapy.  (Tr. 230, 233).  Plaintiff was also counseled on the abuse of tobacco, however, Plaintiff was unwilling to stop smoking. *(Id.*).

On January, 17, 2006, Plaintiff underwent a consultative psychological evaluation completed by Norman Berg, Ph.D. ("Dr. Berg").  (Tr. 157-163).  At the evaluation Plaintiff reported that he was capable of: fishing, bowling, cooking, cleaning, doing laundry, shopping, and grooming himself.  (Tr. 158-159).  Testing indicated that Plaintiff had a verbal IQ score of 70, a performance IQ of 75, and a full scale score of 70, which put him in the lower range of borderline intelligence.  (Tr. 160).  However, Dr. Berg felt that, "[c]linically, the claimant seemed to function somewhat higher with his estimated level of intelligence being in the borderline to low average range."  (*Id*.).  Dr. Berg emphasized that Plaintiff "definitely was not mentally retarded."  (*Id*.).  Dr. Berg felt that Plaintiff's memory test scores were "commensurate with borderline intelligence" but did

not indicate any major impairment in memory function.  (Tr. 161).  Plaintiff asserted that his memory functions were fairly good and that he did not have any significant mental condition that would prevent him from holding employment.  (Tr. 157-158).  Dr. Berg diagnosed Plaintiff with borderline intellectual functioning and Global Assessment of Functioning (GAF) score of 66, which indicates only "mild symptoms" but that a person is "generally functioning pretty well."[1]  (Tr. 161).  Dr. Berg opined that Plaintiff had no limitations on understanding and following simple directions; maintaining attention and concentration while doing simple tasks; and sustaining activity.  (Tr. 162).  Dr. Berg opined that Plaintiff had only mild limitations in coping with routine stress.  (*Id.*).

On February 2, 2006, Plaintiff saw Dr. Warm for a follow-up evaluation.  (Tr. 226).  Dr. Warm noted that Plaintiff's ability to perform standing and sitting was not affected and that he was only mildly disabled for walking and successfully ambulated with a cane.  (*Id.*).  Plaintiff admitted that he had not taken his blood pressure medications for a week, and exhibited 4/5 strength in his left arm and leg and 5/5 strength on his right side.  (*Id.*).  Dr. Warm gave Plaintiff the highest of five ratings in his psychological assessment, corresponding to "Essentially good functioning in all areas," and "Occupationally and socially effective."  (Tr. 165).

On February 16, 2006, Plaintiff returned to see Dr. Warm, reporting dizziness from his medication and left sided paresis.  (Tr. 224).  Dr. Warm noted that Plaintiff's hypertension had improved, but was still borderline and that Plaintiff had no stroke

---

[1] An individual's GAF, which measures psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness, is rated between zero and 100, with lower numbers indicating more severe mental limitations.  A GAF rating between 61 and 70 indicates "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning…but generally functioning pretty well…" American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders,* 34 (4th ed., text rev. 2000).

symptoms or complaints of pain.  (Tr. 224-225).  At this time, Dr. Warm completed a mental functional capacity assessment ("MFC") on Plaintiff.  (Tr. 185-186).  Dr. Warm found that Plaintiff was markedly limited in his ability to: carry out detailed instructions, maintain attention and concentration for extended periods, perform activities within a schedule, maintain regular attendance, be punctual within customary tolerances, and complete a normal workday or workweek without interruptions from psychologically based symptoms.  (Tr. 185).  Dr. Warm also determined that due to Plaintiff's stoke and his slow recovery, Plaintiff was unemployable.  (*Id.*).

On February 7, 2006, state agency psychologist Leslie Rudy, Ph.D ("Dr. Rudy") reviewed Plaintiff's record and, giving the most significance to Dr. Berg's consultative examination findings, concluded that Plaintiff had limitations based on his borderline intellectual functioning.  (Tr. 169).  Dr. Rudy determined that Plaintiff needed to work in a familiar environment and do work that was simple to learn and remember, did not require attention to a lot of detailed tasks, and did not require time or quota demands.  (*Id.*).  Dr. Rudy also indicated that Plaintiff had moderate difficulties in maintaining concentration, persistence, or pace; no episodes of decompensation; mild difficulties with social functioning; and no limitations on his activities of daily living.  (Tr. 181).

On July 15, 2006, state agency physician, Roberta Neiger, M.D. ("Dr. Neiger"), reviewed Plaintiff's medical record and concluded that Plaintiff could lift/carry 20 pounds occasionally and 10 pounds frequently; could stand and/or walk for about two to four hours; required a hand-held assistive device for ambulation; could sit for about six hours; and could not operate foot controls with his left leg.  (Tr. 195-202).  She opined that Plaintiff could occasionally climb ramps/stairs, stoop, kneel, and crouch, but could

13

never balance or climb ladders, ropes, or scaffolds (Tr. 197) and should avoid all exposures to hazards.  (Tr. 199).  Dr. Neiger indicated that Plaintiff had no manipulative limitations and thus, did not meet Listing 11.04(B).  (Tr. 193).  Dr. Neiger's opinions were later affirmed by Malika Haque, M.D. ("Dr. Haque"), on July 28, 2006.  (Tr. 192).

On May 5, 2006, Dr. Warm completed a physical residual functional capacity assessment ("RFC").  (Tr. 188-191).  Dr. Warm identified symptoms of poor coordination, balance problems, unstable walking, weakness, loss of manual dexterity, fatigue, pain, and depression.  (Tr. 188).  Dr. Warm asserted that Plaintiff was not capable of walking or standing for any length of time and that he was only capable of sitting for one hour at a time. (Tr. 189).  Dr. Warm limited Plaintiff's ability to sit, stand, and walk less than two hours total during an eight-hour workday and felt that the Plaintiff could rarely lift less than 10 pounds.  (Tr. 189-190).  Dr. Warm also asserted that Plaintiff was incapable of performing even low stress jobs and would miss more than four days per month due to his impairments.  (Tr. 164-165, 185-186, 188-191).

Additionally, Dr. Warm indicated that Plaintiff had left arm paresis, but did not have "significant and persistent disorganization of motor function in two extremities resulting in sustained disturbance of gross and dexterous movement or gait and station."  (Tr. 188-189).  Dr. Warm also stated that Plaintiff could only sit one hour at a time; could stand for "0" minutes; could rarely lift/carry less than 10 pounds; could not even walk one block; could never perform postural activities; and could not perform any reaching, handling, or fingering with his left hand.  (*Id.*).

On Plaintiff's follow-up examinations with Dr. Warm on January, March, and April 2007, Dr. Warm noted that on a scale of 1-5: Plaintiff had a 4 on his left side with

decreased sensation in his left hand, his hypertension was "much improved," and he had no stroke symptoms.  (Tr. 208-209).  On May 11, 2007, Plaintiff's blood pressure was noted to have improved at 110/80, he had no stroke symptoms, and he reported that he was feeling good.  (Tr. 208).  On November 7, 2007, Dr. Warm noted that Plaintiff had left-sided paresis, but also noted that Plaintiff had no stroke symptoms or pain, and that Plaintiff's hypertension was under "excellent control."  (Tr. 206).  On February 21, 2008, Dr. Warm indicated that Plaintiff's hypertension remained "well controlled" with medication.  (Tr. 264).  Plaintiff only complained of 2 minor unrelated issues.  (*Id.*).  Plaintiff last saw Dr. Warm on May 5, 2008, at which time his blood pressure was well controlled at 128/96.  (Tr. 267).

From May 21, 2008 to July 8, 2008, Plaintiff sought physical therapy due to left knee pain.  (Tr. 269-278).  During that time, Plaintiff attended four physical therapy sessions.  (*Id.*).  On July 2008, Plaintiff's physical therapist, Jennifer Ripley, MPT ("Therapist Ripley"), noted that Plaintiff's range of motion was within normal limits except for a limited range of motion in his left ankle and decreased ability to balance on his left leg.  (Tr. 272-273).  Therapist Ripley recommended treatment for an additional four weeks to correct Plaintiff's gait and increase strength, balance, and flexibility.  (Tr. 272).  Therapist Ripley assessed Plaintiff's rehabilitation potential as fair to good, but noted that his compliance was an issue.  (*Id.*).  On July 15, 2008, Plaintiff was discharged from physical therapy due to noncompliance, without having met any of his functional goals.  (Tr. 269).

### IV.  Plaintiff's Testimony at the Hearing

Plaintiff testified at the administrative hearing that prior to his stroke in July 2005

he previously worked as a maintenance worker at Uptown Towers for 11 years. (Tr. 288). Plaintiff also testified that while he worked at Uptown Towers he engaged in the following: lighting; plumbing; electrical work; heating, ventilation, and air conditioning work; and maintained the grounds. (*Id.*). He also reported that he could previously lift 50 to 100 pounds. (*Id.*). He testified that after his stroke, he was unable to do his job and as a result, Uptown Towers terminated him. (*Id.*). Plaintiff testified that he is still experiencing problems related to his stroke and that he has to use a cane because he has difficulty walking, standing, and carrying things. (Tr. 290-291, 294). His medications included Tylenol, Atenolol, Simvastatin, Norvasc, and a water pill. (Tr. 290, 293). He reported that his medications helped for the most part, but made him tired. (Tr. 298). Plaintiff also testified that his medication makes it difficult for him to function and concentrate. (*Id.*).

As to his daily activities, Plaintiff testified that he smokes half a pack of cigarettes, watches television, reads books, cleans his residence, and fishes. (Tr. 295-296). Plaintiff reported that he is able to personally groom himself and cook his meals. (Tr. 296). Plaintiff testified that he does not do laundry, grocery shop, or clean the dishes and only takes the garbage out if it is light. (*Id.*). Plaintiff felt that he could do a job "[a]s long as I don't get tired . . . [and] I ain't got to use my left hand that much." (Tr. 297). Plaintiff reported taking about two or three naps per day due to drowsiness caused by his medication. (Tr. 298). Plaintiff testified that his stroke affected his memory in that he sometimes forgot things that "happened a month ago or a couple days ago" but that "[s]ometimes it will come back." (*Id.*).

Plaintiff testified that he has problems holding and lifting things because of

16

swelling and pain in his left hand.  (Tr. 293, 297).  Plaintiff estimated that he could not lift more than five pounds.  (Tr. 293-294).  However, Plaintiff also estimated that he could lift about 20 pounds with both hands.  (*Id.*).  Plaintiff testified that he could walk for about two blocks.  (Tr. 294).  Plaintiff testified that he could stand at maximum of half an hour. (*Id.*).  Plaintiff reported that he experiences pain in his left hip.  (*Id.*).  Plaintiff also testified that he does not eat sometimes because it does not agree with his stomach. (Tr. 297).

### V. Analysis

On appeal to this Court, Plaintiff assigns five errors in this case.  First, Plaintiff contends that ALJ Temin erred when he failed to find that the severity of the residuals of his previous stroke met and/or equaled Listing 11.04(B).  Second, Plaintiff argues that ALJ Temin erred when he rejected the opinion of Plaintiff's treating physician, Dr. Warm.  Third, Plaintiff argues that ALJ Temin erred when he failed to include mental limitations in his RFC assessment that accounted for Plaintiff's scores in the extremely low range on the Memory Scale testing.  Fourth, Plaintiff argues that ALJ Temin erred by relying on an improper hypothetical to the vocational expert that he claims does not constitute substantial evidence of his vocational abilities.  Fifth, Plaintiff claims that ALJ Temin inadequately assessed Plaintiff's pain and credibility.

### A. ALJ Temin's Failure to Find Plaintiff Disabled Under Listing 11.04(B)

In Plaintiff's first assignment of error, he argues that ALJ Temin erred by failing to find that the severity of the residuals of Plaintiff's cerebrovascular accident on July 15, 2005, met the criteria under Listing 11.04(B).  (Doc. 10 at 9).  Plaintiff contends that he meets the criteria for a presumptive award of benefits under this Listing based upon the

significant impairments that he allegedly suffers from. (*Id.*).

Plaintiff argues that ALJ Temin erred in failing to consider the evidence of significant and persistent disorganization of motor function in his left upper extremity and left lower extremity more than three months after the cerebrovascular accident on July 15, 2005. (Doc. 10 at 10). In order to meet Listing 11.04(B), Plaintiff must demonstrate by medically acceptable clinical and laboratory diagnostic techniques, significant and persistent disorganization of motor function in two extremities, resulting in sustained disturbance of gross and dexterous movements, or gait and station, more than three months post-cerebral vascular accident. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, §11.04(B). Section 11.00C provides:

> Persistent disorganization of motor function in the form of paresis or paralysis, tremor or other involuntary movements, ataxia and sensory disturbances (any or all of which may be due to cerebral or cerebellar, brain stem, spinal cord, or peripheral nerve dysfunction) which occur singly or in various combination, frequently provides the sole or partial basis for decision in cases of neurological impairment. The assessment of impairment depends on the degree of interference with locomotion and/or interference with the use of fingers, hands and arms.

20 C.F.R. Pt. 404, Subpt. P, App. 1, §11.00(C).

Contrary to Plaintiff's allegations, ALJ Temin properly determined that Plaintiff failed to meet the criteria of Listing 11.04(B). In making his determination, ALJ Temin relied on the examinations completed by Dr. Warm on February 2, 2006, and May 5, 2006. (Tr. 188-191). In his examinations Dr. Warm explicitly refuted that Plaintiff had "significant and persistent disorganization of motor function in two extremities resulting in sustained disturbance of gross and dexterous movement of gait and station." (Tr. 188-189). For example, on February 2, 2006, Dr. Warm opined that Plaintiff's ability to perform standing and sitting was not affected and that he was only mildly disabled for

walking. (Tr. 165). Dr. Warm further opined that Plaintiff had essentially good functioning in all areas. (*Id.*). In addition, ALJ Temin also relied on the following: clinical findings of normal or only mildly diminished left-sided motor strength; Plaintiff's statements about his abilities to carry, sit, walk, perform significant activities, and work; and medical opinions of Dr. Warm, Dr. Neiger, and Dr. Haque, which were consistent with Plaintiff retaining the ability to perform a range of sedentary work. (Tr. 17-18, 165, 192-199, 209, 226, 233, 272, 274, 293-297). Based on the above, ALJ Temin properly found that the objective medical evidence does not support the existence of "[s]ignificant and persistent disorganization of motor function in two extremities, resulting in sustained disturbance of gross and dexterous movements, or gait and station." 20 C.F.R. part 404, Subpt. P, App. 1, §11.04(B).

Plaintiff also claims ALJ Temin erred when he relied on Dr. Neiger's opinion that Plaintiff failed to satisfy the requirements of §11.04(B). (Doc. 10 at 10). However, the Court finds that even if Dr. Neiger's opinion was flawed, it would still not constitute proof that Plaintiff met the Listing. Specifically, a claimant has the burden of proving that his impairments meet or equal a Listing. *Bowen v. Yuckert,* 482 U.S. 137, 146 n.5 (1987) (burden is on claimant through the fourth step of the sequential evaluation process).

Furthermore, the Court has determined that Dr. Neiger's opinion was not flawed. Dr. Haque reviewed Plaintiff's updated medical record on July 28, 2006, 12 months after Plaintiff's stroke and affirmed Dr. Neiger's opinion as accurate as of that date. (Tr. 193). Thus, Dr. Neiger's projection of Plaintiff's functional abilities 12 months after his stroke, based on the assumption that Plaintiff would continue to improve and his young age, was reasonable and adequately assessed the issue of medical equivalence. (Tr. 193).

*See Curry v. Sec'y of Health & Human Servs.,* 856 F.2d 193, 1988 WL 89340, at *5 (6th Cir. Aug. 28, 1998) (citing *Fox v. Heckler,* 776 F.2d 738, 742 (7th Cir. 1985)) state agency reviewing physician's opinion that claimant's condition did not equal requirements of a listed impairment was sufficient proof that the agency adequately considered medical equivalence).  Therefore, for the reasons stated above, Plaintiff's argument does not have merit.

### B.  The ALJ's Rejection of Dr. Warm's, Dr. Neiger's, and Dr. Rudy's Opinions

Plaintiff complains that ALJ Temin failed to afford adequate weight to the opinions of the following medical experts: physicians, Dr. Warm and Dr. Neiger, and psychologist, Dr. Rudy.  20 C.F.R. §404.1527(d)(2) provides: "[i]f we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) *is well-supported by medically acceptable clinical and laboratory diagnostic techniques* and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight."  *Id.*  (emphasis added).  *See Warner v. Comm'r of Soc. Sec.,* 375 F.3d 387, 390 (6th Cir. 2004).  Thus, "if the treating physician's opinion is not supported by objective medical evidence, the ALJ is entitled to discredit the opinion as long as he sets forth a reasoned basis for her rejection."  *Jones,* 336 F.3d at 477; *see also* 20 C.F.R. §1527(d)(2).  Likewise, where conclusions regarding a claimant's functional capacity are not substantiated by objective evidence, the ALJ is not required to credit those conclusions.  *Cutlip v. Secretary of Health and Human Services,* 25 F.3d 284, 287 (6th Cir. 1994); *accord Blacha v. Secretary of Health and Human Services,* 927 F.2d 228, 230-231 (6th Cir. 1990) (affirming finding of non-disability despite herniated disc and degenerative arthritis in the spine.).

**1. Dr. Warm**

Dr. Warm, Plaintiff's primary care physician, has treated Plaintiff since September 16, 2005, for hypertension and problems resulting from his stroke. (Tr. 236). On February 2, 2006, Dr. Warm diagnosed Plaintiff with a stroke and hypertension. (Tr. 164). Dr. Warm noted that Plaintiff was 5'9'' tall and weighed 246 pounds. (*Id.*). Dr. Warm opined that the Plaintiff's ability to perform standing and sitting was not affected and that he was only mildly disabled for walking and that he was mostly using a cane. (Tr. 165). Dr. Warm further opined that Plaintiff had essentially good functioning in all areas. (*Id.*). On February 16, 2006, Dr. Warm completed a mental functional capacity assessment. (Tr. 185-186). He found that Plaintiff was markedly limited in his ability to carry out detailed instructions, maintain attention and concentration for extended periods, to perform activities within a schedule, maintain regular attendance, to be punctual within customary tolerances and to complete a normal workday or workweek without interruptions from psychologically based symptoms. (Tr. 185). He further opined that Plaintiff was unemployable and that he had a disabling left sided stroke and has had a slow recovery. (Tr. 186).

On May 5, 2006, Dr. Warm completed a physical residual functional capacity assessment (RFC). (Tr. 188-191). Dr. Warm identified symptoms of poor coordination, balance problems, unstable walking, weakness, loss of manual dexterity, fatigue, pain, and depression. (Tr. 188). Contrary to his opinion 3 months earlier, Dr. Warm was now of the opinion that Plaintiff was not capable of walking or standing for any length of time and that he was only capable of sitting for one hour at a time. (Tr. 189). He limited Plaintiff to sitting, standing, and walking less than two hours total during an eight hour

workday and felt that Plaintiff could rarely lift less than ten pounds. (Tr. 189-190). Dr. Warm further opined that Plaintiff was incapable of performing even low stress jobs and would miss more than four days per month due to his impairments. (Tr. 164-165, 185-186, 188-191).

In his decision, ALJ Temin did not afford controlling weight to Dr. Warm's assessment of Plaintiff's extreme limitations:

> [D]r. Warm finds that the claimant cannot perform even a full range of sedentary work. However, the claimant testified that he was capable of lifting up to 20 pounds with both hands, stand 30 minutes at a time, walk two blocks, and sit for one hour at a time. There is no objective support given for Exhibit 8F, and no such support is found in the treating records. The claimant was able to keep his blood pressure under control when compliant with his medication, had no new stroke symptoms, and he was noted to have improved (Exhibits 10F, 11F). The record does not show residuals from the stroke that would prevent claimant from performing work within the limitations of the residual functional capacity given.

(Tr. 20). Plaintiff contends that the limitations found by Dr. Warm were supported by documented objective findings that supported his opinion. Plaintiff alleges that Dr. Warm documented left hemiparesis upon physical examination throughout his treatment notes. (Doc. 10 at 12). Plaintiff also claims that while one examiner reported strength was 5/5 in all extremities on one occasion in October 2005, every other note from Dr. Warm's office that specifically documents motors/muscle strength noted strength was 4/5 in the left upper extremity and left lower extremity. (*Id.*). Plaintiff asserts that Dr. Warm's opinion is further supported by the physical examination findings of Therapist Ripley, who reported that Plaintiff's strength was 4/5 in the left hip, knee, and ankle during her evaluation on July 8, 2008. (*Id.*). However, although the opinions of treating physicians must be considered, ultimately the determination of a claimant's RFC is "reserved to the Commissioner." 20 C.F.R. §404.1527(d)(2), §1527(e)(2).

In rejecting the limitations assessed by Dr. Warm, ALJ Temin explained that, nothing in the record shows that Plaintiff has had continuing problems as a result of his stroke. (Tr. 19).  For instance, on his follow-up visits "no new stroke symptoms" were noted on a number of occasions.  (*Id.*).  His blood pressure was found to be well controlled with medications.  (*Id.*).  ALJ Temin went on to point out that Dr. Warm's assessment of Plaintiff's functional abilities is not well supported by medically acceptable clinical and laboratory diagnostic techniques nor consistent with the other substantial evidence in the case record.  (*See Id.*).  By way of example, ALJ Temin provided that Plaintiff, with his impairments, continued to perform activities of daily living, including: playing cards, taking care of his personal needs, paying bills, counting change, and using a checkbook.  (Tr. at 20).  ALJ Temin also noted that Plaintiff could go shopping, watch television, visit with friends and family, and wash the dishes.  (*Id.*).  ALJ Temin's rejection of Dr. Warm's assessment satisfies the "good reasons" requirement.  The extreme limitations found by Dr. Warm are not supported by objective medical evidence.  Rather, I conclude from a review of the same medical records that substantial evidence supports ALJ Temin's assessment.

The record does reflect a diagnosis of a prior cerebrovascular accident, hypertension, and borderline intellectual functioning; however, the record does not support Dr. Warm's assessment of Plaintiff's negative functional abilities.  A diagnosis, in and of itself, is not conclusive evidence of disability because it does not reflect the limitations, if any, that it may impose upon an individual.  *See Young v. Secretary of Health and Human Services,* 925 F.2d 146, 151 (6th Cir. 1990); *Wallace v. Astrue*, 2009 WL 6093338 at *8 (6th Cir. December 1, 2009).

23

Dr. Warm himself repeatedly noted that Plaintiff had no new stroke symptoms between September 2005 and November 2007.  (Tr. 206, 208, 223-226, 229, 236).  In addition, Dr. Warm's notes indicated that Plaintiff's blood pressure was "perfect!" in November 2006, under "great control!" in January 2007, "much improved" with medications in April 2007, under "excellent control" in November 2007, and "well controlled" with medication in February 2008.  (Tr. 206, 208, 211, 214, 264).  ALJ Temin also considered Plaintiff's statements regarding his abilities, which also supports that he retained the ability to perform a range of sedentary work.  As ALJ Temin discussed, Plaintiff testified that he could lift about five or 10 pounds with his left hand and 20 pounds with both hands.  (Tr. 17, 293-294).  Plaintiff estimated that he could stand for about half an hour, walk about two blocks with his cane, and sit for an hour at a time before needing to stand up and move around.  (Tr. 17, 294-295).  Plaintiff also believed that he was capable of light duty work, as evidenced by his request to Dr. Warm on January 3, 2007 for a letter to help him secure light duty work and his testimony that he could do a job "as long as I don't get tired . . . [and] I ain't got to use my left hand that much."  (Tr. 297).  Plaintiff's own statements about his abilities and activities supported the ALJ's conclusion that Plaintiff could perform a range of sedentary work.  (Tr. 16).  *See* 20 C.F.R. §404.1529(c)(3), (c)(3)(I) (authorizing an ALJ to consider a claimant's statements and activities when evaluating pain and functional limitations); *See also Warner,* 375 F.3d at 392 (permitting an ALJ to consider daily activities such as housework and social activities in evaluating complaints of disabling pain).  *See* 20 C.F.R. §404.1527(d)(4) ("Consistency."  Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.").

Moreover, in regards to Plaintiff's mental impairments, ALJ Temin noted that Dr. Warm is not a mental health specialist, did not treat Plaintiff for his mental impairments, and his conclusions are inconsistent with that of Dr. Berg, a psychologist who examined Plaintiff.  (Tr. 20).  At the psychological evaluation on January 17, 2006, Dr. Berg assigned Plaintiff a GAF score of 66, based on depressive features related to physical limitations that he experienced as a result of his stroke.  (Tr. 161).  His report notes that Plaintiff stated that he did not have any significant emotional or psychological condition that would prevent him from working.  (Tr. 162).  Plaintiff also stated that he has never been hospitalized and has never received ongoing mental health treatment as an adult.  (Tr. 159).  Dr. Berg also opined that Plaintiff had no limitations understanding and following simple direction, maintaining attention and concentration while performing simple work-related tasks, and no limitation sustaining his level of activity.  (Tr. 162).  Dr. Berg further opined that Plaintiff was mildly impaired coping with routine job stress due to his concern about fully recovering from his stroke.  (*Id.*).

Even if the Court were to assume that Dr. Warm's opinions were consistent with the other record evidence, it is not necessarily enough to warrant reversal; "[a]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision."  *Mullen v. Bowen,* 800 F.2d 535, 545 (6th Cir. 1986).  Specifically, Dr. Warm failed to provide a detailed explanation as to his extreme limitations in view of the absence of any focal deficit of motor power or reflexes and the generally conservative nature of Plaintiff's treatment.

The Court also finds it important to note that Dr. Warm failed to put in his explanation that Plaintiff had not actively pursued any psychotherapy or mental health

treatment.  *See* 20 C.F.R. §404.1527(d)(3) ("the better an explanation a source provides for an opinion, the more weight we will give to that opinion.").  In Plaintiff's RFC, Dr. Warm simply checked boxes indicating that Plaintiff's ability to sit, stand, and walk was affected.  (Tr. 189).  Dr. Warm also checked that due to Plaintiff's impairments his reaching, handling, and fingering abilities were limited, but gave no reasons why he believed this to be so.  (Tr. 190).  Therefore, for the reasons stated above, Plaintiff's argument does not have merit.

### 2. Dr. Neiger and Dr. Rudy

Plaintiff next asserts that ALJ Temin failed to discuss and rely upon the medical opinions of Dr. Neiger and Dr. Rudy, the state agency medical consultants, who reviewed the medical evidence of record and completed residual functional capacity forms at the request of the state agency.  (Doc. 10 at 13).  Plaintiff claims that in the section of his decision addressing his RFC findings and the opinion evidence of record, ALJ Temin only discussed the opinion of Dr. Warm and the psychological evaluation completed by Dr. Berg.  (*Id.*).  Plaintiff argues that because ALJ Temin never mentioned Dr. Neiger's or Dr. Rudy's assessment, he clearly did not provide a clear indication of the amount of weight he afforded their opinions.  (*Id.*).

Contrary to Plaintiff's allegations, the Court finds that ALJ Temin did rely on Dr. Neiger's opinion in determining Plaintiff's RFC.  After reviewing the record, the Court has found that Dr. Neiger's opinions are fully supportive of and *less restrictive* than ALJ Temin's RFC.  While it is true that ALJ Temin did not explicitly cite to Dr. Neiger's opinion, the Court notes that ALJ Temin's highly detailed RFC finding so closely mirrors Dr. Neiger's findings that one may infer ALJ Temin considered her opinion.

Furthermore, ALJ Temin did not commit reversible error by failing to specifically mention Dr. Rudy's mental RFC assessment.  The Sixth Circuit has held that when an ALJ does not mention a medical opinion, a reviewing court "may look to any evidence in the record, regardless of whether it has been cited by the [agency]," to determine whether the error was harmless.  *Heston v. Comm'r of Soc. Sec.,* 245 F.3d 528, 535 (6th Cir. 2001).  In this case, the record reflects that ALJ Temin considered and credited Dr. Rudy's opinion.  *Heston,* 245 F.3d at 536.  ALJ Temin concluded that Plaintiff had moderate difficulties in concentration, persistence, and pace due to his borderline intellectual functioning; no episode of decompensation; and mild difficulties with social functioning and activities of daily living.  (Tr. 16).  The wording of the categories and the degree of limitation that the ALJ found in each category closely track Dr. Rudy's opinion, in which Dr. Rudy opined that Plaintiff had moderate difficulties in maintaining concentration, persistence, or pace; no episodes of decompensation; mild difficulties with social functioning; and no limitations on his activities of daily living.  (Tr. 181). Given that no other source analyzed these four specific categories of limitations, besides Dr. Rudy, ALJ Temin clearly considered her opinion.  Therefore, for the reasons stated above, Plaintiff's argument does not have merit.

### C.  Plaintiff's Mental RFC

In Plaintiff's next assignment of error, he alleges that ALJ Temin improperly determined Plaintiff's Mental RFC because he solely relied on Dr. Berg's assessment and failed to include Plaintiff's low memory testing results from Dr. Rudy's assessment. (Doc. 10 at 14).  Plaintiff claims that Dr. Berg's opinion concerning the absence of impairment in memory function is inconsistent with the Memory Scale scores obtained

by Plaintiff during his evaluation with Dr. Rudy. (*Id.*). Plaintiff argues that his low memory testing scores support a more restrictive RFC than that provided for by ALJ Temin. (*Id.*).

However, the Court notes that ALJ Temin's RFC sufficiently accounted for Plaintiff's low memory testing results in determining Plaintiff's mental limitations. ALJ Temin adequately accommodated Plaintiff's borderline intellectual functioning by limiting Plaintiff to "remember[ing] and carry[ing] out only short and simple instructions." (Tr. 16). *See Newland v. Apel,* 182 F.3d 918, 1999 WL 435153, at *6 (6th Cir. June 17, 1999) (finding that an RFC that limited a claimant to simple and repetitive jobs without complex or written instructions adequately accommodated the claimant's borderline intellectual functioning). Here, Dr. Berg concluded that Plaintiff could understand and follow simple directions; maintain attention and concentration while doing simple tasks; and sustain activity. (Tr. 162). In addition, the Court finds that it is important to note that Plaintiff performed past relevant work as a maintenance worker between 1992 and 2005, which the vocational expert classified as skilled work. (Tr. 71, 301). Therefore, the Court finds that the mental limitations ALJ Temin imposed were supported by substantial evidence, and Plaintiff's history of skilled work suggests that ALJ Temin gave Plaintiff the benefit of the doubt when he determined Plaintiff's work-limit restrictions.

Moreover, Plaintiff failed to provide any medical evidence refuting Dr. Berg's conclusions that Plaintiff's low memory testing results were "commensurate with borderline intelligence" and did not indicate any major impairment in memory function. (Tr. 160-161). The Court notes that Plaintiff merely speculates that his scores would

reflect a degree of major impairment in memory function. (Doc. 10 at 15). Plaintiff's lay opinion falls short of meeting his burden of proof. *See* 20 C.F.R. §404.1512(c) ("You must provide medical evidence showing that you have an impairment(s) and how severe it is . . . [and] how your impairment(s) affects your functioning . . ."). ALJ Temin reasonably relied on Dr. Berg's opinion when determining the degree of Plaintiff's mental limitations. *See* 20 C.F.R. §404.1527(f)(2)(I) ("State agency . . . psychologists are highly qualified . . . psychologists who are also experts in Social Security disability evaluation."). Therefore, for the reasons stated above, Plaintiff's argument does not have merit.

### C. Vocational Expert's Testimony

Plaintiff contends in his fourth statement of error that ALJ Temin erred by asking VE Daoud a hypothetical question that was not based on substantial evidence because it did not reflect limitations set forth by Dr. Warm. (Doc. 10 at 15). Plaintiff asserts that Dr. Warm's opinion was entitled to controlling weight as it was supported by objective medical findings and was not inconsistent with other substantial evidence of record. (*Id.*). However, as the Court has previously provided, ALJ Temin carefully explained that Dr. Warm's extreme opinion was neither supported by the evidence nor consistent with the record. (Tr. 20). *See* 20 C.F.R. §404.1527(d)(2) (If "a treating source's opinion on the issue(s) of the nature and severity of [a claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's case record, we will give it controlling weight."); *Cutlip,* 25 F.3d 284, 287 (6th Cir. 1994) (Physician opinions "are only afforded great weight when they are supported by sufficient clinical

findings and are consistent with the evidence.").

The Court also notes that ALJ Temin pointed out that even if Plaintiff could not perform his previous job as a maintenance worker, VE Daoud identified a significant number of jobs in the national and regional economy that Plaintiff could perform including: general clerical jobs (3,000 jobs in the regional economy and 418,375 jobs in the national economy), packager (340 jobs in the regional economy and 32,000 jobs in the national economy), and surveillance monitor (145 jobs in the regional economy and 25,210 jobs in the national economy).  (Tr. 21).  Therefore, based on the large number of jobs Plaintiff remains eligible for, Plaintiff's argument does not have merit.

### D.  Credibility Assessment and Evaluation of Pain

Plaintiff's fifth statement of error finds fault with ALJ Temin's conclusion that his testimony was not entirely credible.  Specifically, Plaintiff claims that ALJ Temin failed to consider all of the factors listed in 20 C.F.R. §404.1529 and Social Security Ruling 96-7p (1996).  Plaintiff asserts that ALJ Temin erred when: 1) he indicated that Plaintiff failed to show continuing problems as a result of his stroke; 2) that the medical record established Plaintiff was "not always compliant with his medical treatment"; and 3) when he relied on Plaintiff's testimony regarding his daily activities.  (Doc. 10 at 17).

A disability claim can be supported by a claimant's subjective complaints, as long as there is objective medical evidence of the underlying medical condition in the record. *Jones,* 336 F.3d at 475.  However, "an ALJ is not required to accept a claimant's subjective complaints and may properly consider the credibility of a claimant when making a determination of disability." *Id.* at 476.  (citations omitted).  An ALJ's credibility assessment must be supported by substantial evidence, but "an ALJ's findings based

on the credibility of the applicant are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility." *Walters v. Comm'r of Soc. Sec.,* 127 F.3d 525, 531 (6th Cir. 1997). Further, a credibility determination cannot be disturbed "absent a compelling reason." *Smith v. Halter,* 307 F.3d 377, 379 (6th Cir. 2001). Thus, it is proper for an ALJ to discount the claimant's testimony. *Warner,* 375 F.3d at 392.

In this matter, ALJ Temin noted various factors in his decision that caused him to question Plaintiff's credibility. For instance, he noted that Plaintiff has not always been fully compliant with treatment – declining physical therapy services, refusing to take his prescribed blood pressure medication for several months, and even continuing to smoke a half a pack of cigarettes a day. (Tr. 263). On October 4, 2005, Plaintiff was advised to quit smoking because of the risk of another stroke, but Plaintiff would not comply. (Tr. 230). Further, it was noted that Plaintiff was terminated from therapy because he declined to continue treatment or was non-compliant and he had only shown-up for four appointments and did not meet any of the goals. (Tr. 269). Moreover, Plaintiff reported engaging in a wide variety of activities which appear inconsistent with a totally debilitated individual such as fishing and cleaning his residence. (Tr. 296). Plaintiff also testified that he watches television and visits with his friends and family. (Tr. 295-296).

ALJ Temin found that, "the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms," (Tr.19), and that Plaintiff has established by sufficient evidence that he suffers from the following "severe" impairments: status post July 15, 2005, cerebrovascular accident, hypertension, and

borderline intellectual functioning.  (Tr. 15).  However, in reviewing the lack of objective medical evidence, ALJ Temin also found that Plaintiff's statements concerning the severity, intensity, persistence, and limiting effects of his symptoms were not credible to the extent that they are inconsistent with the objective medical evidence in the record as a whole.  (*See* Tr. 19).

As noted above, the issue is not whether the record could support a finding of disability, but rather whether the ALJ's decision is supported by substantial evidence. *See Casey v. Sec'y of Health & Human Servs.,* 987 F.2d 1230, 1233 (6th Cir. 1993). Here, ALJ Temin noted that with regard to Plaintiff's cerebrovascular accident, nothing in the record showed that he had continuing problems as a result of his stroke.  (Tr. 19). For instance, on his follow-up visits "no new stroke symptoms" were noted on a number of occasions and his blood pressure was found to be well controlled with medications. (Tr. 206, 208-209, 224-225, 236, 264, 267).  In addition, ALJ Temin found that Plaintiff testified that he was capable of lifting up to 20 pounds with both hands, stand 30 minutes at a time, walk two blocks, and sit for one hour at a time.  (Tr. 293-294).

Therefore, because ALJ Temin found inconsistencies between the objective medical evidence and Plaintiff's testimony about the extent of his pain and limitations, it was permissible for him to discredit Plaintiff's testimony about the severity of his symptoms.  As a result, given the great deference to an ALJ's credibility assessment, I conclude that substantial evidence supports ALJ Temin's decision to discredit Plaintiff's statements about the severity of his symptoms.

### III. Conclusion and Recommendation

For the reasons explained herein, **IT IS RECOMMENDED THAT** Defendant's decision be found to be found to be **SUPPORTED BY SUBSTANTIAL EVIDENCE,** and **AFFIRMED,** and that this case be closed.

*s/Stephanie K. Bowman*_____
United States Magistrate Judge

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

RONALD M. THOMPSON,

      Plaintiff,

    vs.

MICHAEL J. ASTRUE,
COMMISSIONER OF SOCIAL SECURITY,

      Defendant.

Case No. 1:10-cv-371

Spiegel, J.
Bowman, M.J.

## NOTICE

Pursuant to Fed. R. Civ. P 72(b), any party may serve and file specific, written objections to this Report and Recommendation ("R&R") within **FOURTEEN (14) DAYS** of the filing date of this R&R. That period may be extended further by the Court on timely motion by either side for an extension of time. All objections shall specify the portion(s) of the R&R objected to, and shall be accompanied by a memorandum of law in support of the objections. A party shall respond to an opponent's objections within **FOURTEEN (14) DAYS** after being served with a copy of those objections. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).